**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| **NICHOLAS FUNARI, SR.,** | **CIVIL ACTION** |
| Plaintiff, | |
| *v.* | **NO. 2:19-cv-02833-KSM** |
| **MICHAEL FUNARI, et al.**, | |
| Defendants. | |

<u>**MEMORANDUM**</u>

**Marston, J.**                                                    **March 31, 2022**

It is never pretty when a federal court is asked to wade into the depths of a family dispute, and this dispute is uglier than most. The record is replete with mud-slinging from all parties on issues relevant and irrelevant to the legal questions before us. In this opinion, the Court will focus only on the necessary and relevant evidence and continue to hope that one day this tragic family feud will end.

Plaintiff Nicholas Funari, Sr. brings claims under the Racketeer Influenced and Corrupt Organizations Act ("RICO") against three of his sons, Defendants Nicholas Funari, Jr., Joseph Funari, and Michael Funari (Counts I & II). (*See* Doc. No. 1.) For ease of reference, we refer to Plaintiff as "Mr. Funari," and we refer to each son by his first name. Mr. Funari asserts that Nicholas, Joseph, and Michael stole revenue from his business, the business property, three of his rental properties, and the rental revenue from those properties. His sons, in turn, argue that their father is the one who tried to take the properties at issue by filing fraudulent deeds, and he is now trying to deprive them of their livelihoods. In addition to his RICO claim, Mr. Funari also brings state law claims against his three sons, Nicholas's former attorney, Anthony Rubbo,

and Michael's wife, Theresa Funari, to quiet title (Count III), for declaratory judgment (Counts IV & VII), conversion (Count V), conspiracy to commit conversion (Count VI), unjust enrichment (Count VIII), breach of fiduciary duty (Count IX), breach of the covenant of good faith and fair dealing (Count X), and constructive trust (Count XI).  (*Id.*)

Nicholas, Joseph, and Michael have filed a motion for judgment on the pleadings and a motion for summary judgment, each of which seeks judgment on Mr. Funari's RICO claims and asks the Court to decline supplemental jurisdiction over the remaining state law claims.  Mr. Funari has filed his own motion for partial summary judgment, seeking judgment on his state law claims as they relate to the business property and revenue.

For the reasons discussed below, the motions are denied.

## I.    FACTUAL BACKGROUND

As mentioned above, the parties in this case are particularly contentious and the facts are hotly disputed.  Because the Court has competing motions for summary judgment, we must view the evidence differently depending on which motion we are addressing.  Therefore, in this account of the facts, we highlight disputes of fact and give each side's story when necessary to our ultimate analysis.

### A.    The Funari Family

Mr. Funari and his first wife, Blanche Funari, had four sons:  Nicholas, Joseph, Michael, and Claudio Funari.[1]  (*See* Doc. No. 60-1 at 116:10–19 ("Mr. Funari Depo").)  In 1963, Mr. Funari opened an automotive sales and service business called "Nick's Auto Sales" at 2200 Ritner Street in Philadelphia, Pennsylvania (the "Ritner Street Property").  (*See* Mr. Funari Depo. at 8:8–14; Doc. No. 60-4 at 96:1–97:20 ("Michael Depo.").)  The four sons worked at the car lot

---

[1] Claudio is not a party in this case.

2

from a young age, and by their late teenage years, Nicholas and Joseph were working full time at the business.  (Mr. Funari Depo. at 120:10–21; *See also* Doc. No. 60-3 at 35:15–19, 142:3–12 ("J. Funari Depo."); Doc. No. 60-2 at 26:14–23 ("N. Funari Depo.").)  Michael joined them not long after he finished college (*see* M. Funari Depo. at 28:8–24), and Claudio worked at a salvage yard associated with a different car lot owned by his father, this one located at 6600 Essington Avenue in Philadelphia (*see* Doc. No. 60-6 at 15:18–16:2 ("Claudio Depo.")).

In the early 1990s, Blanche Funari passed away.  (*See* M. Funari Depo. at 95:6–9.)  After his wife's passing, Mr. Funari decided to cut back on his working hours; it is unclear from the record whether he entered full retirement or just semi-retirement at this point.  (*See* N. Funari Depo. at 36:19–37:6.)  In addition, about a month after his first wife's death, the woman who would become Mr. Funari's second wife, Maria Funari, and her young daughter, Liza Weinberg, moved in with him.  (*See* M. Funari Depo. at 261:15–262:7; Doc. No. 60-5 at 10:9–16 ("Weisberg Depo.").)  Mr. Funari later adopted Liza, and in her teenage years, Liza, like her brothers, was often working with her father at the car lots.  (Weisberg Depo. at 10:9–19, 24:2–20.)

In addition to his auto businesses, Mr. Funari also heavily invested in real estate, buying numerous properties in Philadelphia and renting them out.  (*See, e.g.*, Mr. Funari Depo. at 53:2–54:14.)  In the late 1990s and early 2000s, his sons, who were in their late twenties at the time, followed suit and began investing in real estate and collecting rental income.  (*See, e.g.*, M. Funari Depo. at 181:4–9, 204:23–205:15; J. Funari Depo. at 137:12–24; N. Funari Depo. at 139:11–21.)  Because they were often busy working long hours at the car lot, Nicholas, Joseph, and Michael sent their father to the real estate closings in their stead.  (*See* N. Funari Depo. at 155:17–156:21.)

It appears that all four men—the father and three sons—had access to the Ritner Street car lot's business account at different times, (*see* Mr. Funari Depo. at 90:11–91:1 (testifying that he frequently took money out of the business account; J. Funari Depo. at 38:14–24 (testifying that Nicholas, Joseph, and Michael each have signing authority on the bank's business account)), and their business and personal accounts were all used to purchase rental properties.

### B.      *The Business and the Ritner Street Property*

Mr. Funari and Nicholas each claim that they own the business and the Ritner Street property on which it sits.  This really amounts to two distinct disputes—one about the business and its revenue and another about the Ritner Street Property.

#### 1.      <u>The Business</u>

As mentioned above, when Mr. Funari opened the business in 1963, it was known as Nick's Auto Sales.  (Mr. Funari Depo. at 8:8–14.)

The three sons claim that around 1992, when their father entered retirement, Mr. Funari transferred the business to Nicholas, and Nicholas ran it as a sole proprietorship first under the name "Nick Jr. & Sons Auto Sales," and later under the name "Nick Jr.'s Auto Sales."[2]  (N. Funari Depo. at 34:24–35:18, 53:6–54:21, 61:13–23 ("Nick's Auto Sales, and then Nick Jr. & Sons.  And then it was Nick Jr.'s Auto Sales."); *see also id.* at 74:17–75:6 (testifying that Mr. Funari did not have an ownership interest in the business when it was "Nick Junior's or Nick Jr. & Sons"); J. Funari Depo. at 48:15–49:1 (testifying that Mr. Funari had an ownership interest in the business until 1993 when he turned it over); M. Funari Depo. at 64:4–65:1 (estimating that the business operated under the name "Nick's Auto" until 1991 or 1992).)

---

[2] Nicholas changed the name because as a sole proprietorship, he could not advertise the business as having other individuals associated with it.

Nicholas does not remember the date that the business was transferred to him or whether the transfer was filed with the government. (N. Funari Depo. at 76:14–77:19.) Nor does he know whether the agreement was committed to writing or whether they conferred with a lawyer about the transfer. (*Id*. at 78:12–78:14.) Nicholas testified that he "didn't pay anything" for the business when he "took it over" in the early 1990s because at that point, the "business wasn't worth anything" and was close to bankruptcy. (*Id*. at 76:14–77:1.) Nicholas only remembers that he had an agreement with his father to "take this business over, and keep that business rolling, because since [Blanche Funari] passed away [Mr. Funari] wanted no more parts of it." (*Id*. at 78:1–6.) According to Nicholas, after transferring the business to him, Mr. Funari continued to work part time as an employee until around 2010. (*Id*. at 34:24–35:18.)

Despite the lack of transfer papers, the business's licensing and tax documents support Nicholas's story. Notably, the licenses and tax documents for the business are in Nicholas's name, (*see* Doc. No. 55-2; N. Funari Depo. at 79:11–14), and he produced a W-2 from 1994 from Nick Jr. & Sons that shows Mr. Funari received wages as an employee (Doc. No. 55-3).

Mr. Funari denies that he was ever an employee of Nick Jr. & Sons. (Mr. Funari Depo. at 22:24–23:15 ("Q: All right. This document seems to indicate that you were an employee of Nick, Junior and Sons. You're denying that? A: Yes, I do.").) During his deposition, Mr. Funari seemed to admit that during the early 1990s, he transferred the business to Nicholas. (*Id*. at 27:14–30:13.) But when he was later asked to clarify what he meant by transferring the business, he backtracked and testified that he had merely made Nicholas the business "manager": "He was like, the manager of the business over his two brothers that were working down there. He was the manager. He was never the owner." (*Id*. at 133:1–10.)

There is no dispute that Nicholas, Joseph, and Michael now run the car lot on Ritner

Street, and Mr. Funari is not involved in the business's affairs. (*Id*. at 128:4–17.) Instead, Mr. Funari runs the car lot on Essington Street.

### 2. The Property

The oldest deed that the Court has seen for the Ritner Street Property is dated February 19, 1975, and it reflects that Mr. Funari and Blanche Funari, granted the Ritner Street Property to their four sons in trust. (*See generally* Doc. No. 60-7.) The parties seem to agree that in the decades that followed, the deed was transferred intrafamily multiple times. (*See* N. Funari Depo. at 133:15–23.) Of relevance here, on March 23, 2002, "Nicholas Funari, Trustee for Nicholas Funari, Jr., Joseph Funari, Michael Funari, and Claudio Funari," conveyed the property to "Nicholas Funari Jr. and Joseph Funari." (*See* Doc. No. 56 at p. 3; J. Funari Depo. at 166:5–20.)

#### i. The March 2008 Deed

Five years later, on March 5, 2008, a deed was filed conveying the property from "Nicholas Funari, Jr. and Joseph Funari" to "Nicholas Funari, Jr. and Nicholas Funari, Sr." (Doc. No. 61-1; N. Funari Depo. at 164:2–15.) Although the deed purports to have been signed by Nicholas and Joseph, both men deny signing it. (N. Funari Depo. at 164:2–165:14 ("Q: Okay. And you did not sign this? A: I did not sign it."); J. Funari Depo. at 82:19–83:13 (testifying that he and Nicholas owned 2200 Ritner until Mr. Funari "illegally signed [his] name" to transfer it to Nicholas and Mr. Funari).)

Mr. Funari testified that he had power of attorney to sign for his four sons on real estate transactions and has produced a power of attorney dated October 3, 2006. (Doc. No. 61-3; *see also* Mr. Funari Depo. at 48:17–49:2.) According to Mr. Funari, his sons granted him power of attorney because they were always busy operating the car lot and frequently could not go with him to real estate meetings. (Mr. Funari Depo. at 135:17–136:10.) And he used the power of attorney to sign his sons' names any time he was buying a home and they were not able to come

to the settlement table.  (*Id*. at 136:24–137:2.)  Claudio confirmed his father's version of events, testifying that he signed the power of attorney, watched Michael sign the power of attorney, and recognizes Nicholas and Joseph's signatures.  (*See* C. Funari Depo. at 44:13–47:1.)

Nicholas, Joseph, and Michael vehemently dispute ever signing the power of attorney. (*See* N. Funari Depo. at 114:22–116:19 ("I absolutely 100 percent did not do that."); M. Funari Depo. at 155:1–158:8 (testifying that he did not recognize any of the four signatures as belonging to himself or his three brothers); *see also id.* at 158:3–161:17 (testifying that he "didn't sign that" and he "never gave [his] dad power of attorney to sign [his] name").)  The three sons argue that their signatures were forged by their father or Maria Funari.  (*See, e.g.*, N. Funari Depo. at 112:8–114:6 (testifying with certainty that his signature and Joseph's signatures were forged and accusing Mr. Funari's current wife, Maria, of "forg[ing] signatures.  She's very good at it").) Consistent with the son's story, John DiGennaro, the real estate agent who routinely attended closings with Mr. Funari, has no recollection of him relying on the power of attorney.  (*See* Doc. No. 61-11 at 14:11–17 ("DiGennaro Depo.") (testifying that he was never presented with a power of attorney and he "do[es] not remember that at all").)

### ii.    The April 2008 Deed

On April 23, 2008, another deed was filed transferring the property, this time from "Nicholas Funari, Jr. and Nicholas Funari, Sr.," to "Nicholas Funari, Jr. and Patricia Funari," Nicholas's wife.  (*See* Doc. No. 61-2; N. Funari Depo. at 119:6–13.)

Nicholas admits that he signed his father's name on the April deed transferring the property into his name and his wife's name.  (N. Funari Depo. at 122:11–17 ("Q: Underneath that, Nicholas Funari, Senior; did you write that?  Did you forge your father's name?  A: Yes. Q: Did your father give you authority to do that?  A: Nope.").)  Nicholas asserts that his forgery was justified because it fixed his father's forged deed.  (N. Funari Depo. at 124:20–125:24 ("I

undid a dirty deed with a dirty deed. . . .  So there was a dirty deed done, and I corrected it the only way I know how.  Because if I didn't, who knows what would have happened."); *see also id.* at 128:6–129:19 (conceding that he forged one deed but testifying that his father "switched 15 deeds, and about 30, 40 or documents"); J. Funari Depo. at 84:22–85:12 (explaining that the deed was "in [J. Funari's] name and Nicky's name . . . .  [T]he property was mine and my brother's.  And then my dad signed my name off the deed and put his name on it.  So my brother signed my dad's name off the deed and put his wife's name on it").)  Michael, in turn, notarized the April 2008 deed, but confirmed during his deposition that his father did not appear before him to sign the deed.  (M. Funari Depo. at 171:2–173:11; *see also id.* at 163:24–166:5 ("Q: Say that again?  A: It was to fix a dirty deed that my dad did.  Q: It was to fix a dirty deed that your dad did it [sic].  Is that what you're saying?  A: Yes, sir.").)

According to Nicholas, he and his father each forged signatures on deeds related to the Ritner Street Property:

> Q:      Who is the Nicholas Funari, Senior that presented on this indenture?  Your father?
>
> A:      Listen, I'm not trying to come off sarcastic or cocky here, but I can't answer that unless you go back a little bit.  Now, this is how it is:  In 2002 this property was in me and my brother Joey's name.  And that's how it sat for years, and years, and years.  And that's how it was.
>
> My dad switched Joey's name illegally.  He forged my brother's name off the deed, and put he himself on the deed.
>
> Are you following me so far? . . .  But somewhere around 2002 this property was in me and Joey's name.  My dad switched Joey off of there, and he put himself on there without Joey's permission.
>
> So I got a paper in the mail — the water bill came in, actually — and it showed Nicholas Funari, Senior and Nicholas Funari, Junior on this paperwork.  So I called City Hall up and said:  Why is this deed in Nicholas Funari, Junior and Nicholas Funari,

Senior's name?  And they said it was switched.

So I went up to City Hall and checked it out, that it was switched, and I seen that my dad pulled a fast one.  So I, in return, figuring my dad's going to borrow money against the property, or he's going to do some kind of hanky panky — so the best way I knew to correct it, I switched it back.

And I told my brother Joey I was switching it back.  And he said he didn't want nothing to do with the property.  And I said: Good, then I'm switching it back into me and Patty's name.

(N. Funari Depo. at 119:14–121:24.)[3]

Although Nicholas paid the recording fee for the April 2008 deed, he has no memory of placing the deed in the mail or using the internet to deliver it to the government.  (N. Funari Depo. at 131:5–20 (confirming that he paid the fee to record the April 2008 deed but claiming he did not remember placing the deed in the mail or using the internet to deliver it to the government).)  Michael, likewise, does not know who delivered the deed or how it was delivered.  (M. Funari Depo. at 173:12–176:24.)

### C.      The Rental Properties

As mentioned above, Mr. Funari and his sons owned numerous rental properties.  Three of those properties are at issue here:  2230 South Chadwick Street (the "Chadwick Street Property"), 2251 South Norwood Street (the "Norwood Street Property"), and 2229 Jackson Street (the "Jackson Street Property").  Mr. Funari claims he paid for and owns each property.  His sons disagree, arguing that Michael is the true owner of the Chadwick Street Property and Joseph is the true owner of the Norwood and Jackson Street Properties.  This disagreement hinges on each property's deed of purchase, which identifies a co-owner as "Nicholas Funari,"

---

[3] Throughout their depositions and in the briefing presented to the Court, the three sons suggest that Nicholas's forgery is justified because Mr. Funari committed fraud first.  We disagree.  The law would be meaningless if such illegalities were allowed on the assertion of "self-help."

without a "senior" or "junior" suffix.  As an aside, we note that neither Mr. Funari nor Nicholas

has a suffix listed on his birth certificate and neither man uses a suffix consistently.  (N. Funari

Depo. at 18:15–22 (discussing birth certificate); *see also id.* 65:4–66:3, 140:16–141:3 ("[W]e

didn't really use 'junior,' 'senior' all the time.").)  In other words, they are *both* "Nicholas

Funari."  Unsurprisingly, this has caused a lot of confusion.

Before turning to the three properties at issue, it is helpful to understand each side's

explanation for why the name, "Nicholas Funari" appears on the deed for each.

### 1.    Mr. Funari's Explanation

According to Mr. Funari, he purchased numerous rental houses, including the three at

issue here, with the assistance of Rose Marie Giuliani, his real estate agent at the DiGennaro

firm.  (*See* Mr. Funari Depo. at 55:1–9; Weisberg Depo. at 57:15–58:8.)  When Giuliani saw a

house for sale for less than $40,000, she would stop by the Ritner Street car lot and tell Mr.

Funari about it.  (*See* Mr. Funari Depo. at 50:4–6; Weisberg Depo. at 57:15–58:8.)  If Mr. Funari

was interested, he would put in an offer, and Giuliani would ask him how he wanted the name to

appear on the deed.  (Mr. Funari Depo. at 53:2–54:14.)  According to Mr. Funari, he frequently

added his sons' names to the deeds, so they would automatically inherit the properties when he

died:

> Q:    You told the title clerk which names to put on the deed?
>
> A:    I didn't tell the title clerk nothing.  Again, I'm telling you.
> That's two times.  I paid for it, and they made the deeds up, I guess,
> the way they made it up.  That's all.
>
> Because a lot of time, I used to get — the real estate girl, she
> used to come down to 22nd and Ritner.  And she used to say to me,
> 'Whose name do you want to put this house under,' and I would say,
> 'Put it under Nicky's name.'  Nicky, dad, how do you want her to
> phrase it?
>
> And he would phrase it however he wanted her to phrase it.

If it was Joey and Joey didn't come up with the money, I would go to the settlement table, and I would put it under my name in trust to Joey.

In the event I died, then the place belongs to Joey. Sometimes she used to come to the garage and she would say to me, 'I got a house for you here for 35,000. Whose name do you want to put this one under?'

I would say, 'Put that under Joseph Funari's name and my name.' It was all according to what kind of mood I was in. If they were bad boys that week and I was hollering at them for something, then I would put it under this name and that name.

So really, I don't know whose name is on these deeds, but most of them I put in — I usually like to put it in trust. If I knew what I knew now, I would have phrased them a little different. I never expected this to happen to me, but it did happen.

And I'll take the penalty. If only his name is on there, then the title speaks for itself. If his name ain't on there and it's in trust, I want my money.

(Mr. Funari Depo. at 53:2–54:14; *see also* Weinberg Depo. at 59:7–24 ("When we would be looking at the property, Rosemarie would ask him whose name do you want to put this one on, and he would say put my name and Joey's name or my name and Michael's name, my name— you know, he would tell her when he put the offer in whose name he was going to put it in because they were always very quick closings and I would go to the settlement table with him.").)

Accordingly, Mr. Funari argues that when the initial deed says "Nicholas Funari," it is referring to him.

### 2.    The Sons' Explanation

The sons offer a different account. According to them, when Mr. Funari went to settlement for each property, he added Nicholas's name to ensure the properties did not go to his other sons' wives in the event that they filed for divorce. (*See* N. Funari Depo. at 152:21–156:21

11

("He wanted to put my name on it to protect Michael."); *see also id.* at 136:10–139:10 (testifying that his father told him, "I think your name should be on that property to protect your brothers, because we don't know what kind of people that they're going to marry."); *id.* at 140:8–15 ("My testimony is, my brother paid for it, and my dad put my name on it as a prenup, without Joey's permission."); M. Funari Depo. at 193:2–194:8; J. Funari Depo. at 119:5–16 (testifying that Nicholas was placed on the deed for the Norwood Property as a "prenup so our wives couldn't take it"); *id.* at 93:8–94:12 (testifying that he knew about his dad wanting to put Nicholas's name on the deed as a "prenup" in case Joseph's wife divorced him, but testifying that he never gave his father permission to do that).)  The Court acknowledges—but declines to publish—the numerous examples in the record of Mr. Funari's disdain for the sons' wives, including hateful name calling and unfounded accusations.

* * *

With this background in mind, we turn to the purchase documents and deed transfers for the Chadwick Street Property, Norwood Street Property, and Jackson Street Property, in turn.

### 3.     The Chadwick Street Property

#### i.     The March 1997 Deed

The Chadwick Street Property was purchased on March 7, 1997 for $28,000.  Michael is identified as the only buyer on the agreement of sale and settlement documents.  (*See* Doc. Nos. 56-4, 56-5; M. Funari Depo. at 272:6–273:2.)  However, the March 1997 deed identifies the owner as "Nicholas Funari, Trustee for Michael Funari."  (Doc. No. 56-6; *see also* N. Funari Depo. at 160:117; M. Funari Depo. at 219:17–10; Mr. Funari Depo. at 42:10–44:11.)

Mr. Funari claims that he is the rightful owner because he paid for the Chadwick Street Property.  (Mr. Funari Depo. at 32:22–33:11 ("Q: All right.  You're testifying that you paid the 28,000 dollars for this property?  A: Definitely.  Question without a doubt."); *id.* at 34:14–35:6;

12

Mr. Funari Depo. at 35:20–36:1 (explaining that he paid the "cash" reference on the agreement of sale).)  And the March 1997 deed is consistent with his typical practice of placing both his name and one of his son's names on deeds for rental properties.  (*See* Weinberg Depo. at 70:17–71:19 ("Q: Okay. The deed is titled, 'Nicholas Funari, Trustee for Michael Funari.' Do you see that?  A: Yes.  Q: Is that consistent with your father's practice and custom that we described earlier?  A: Yes, it is.").)

Michael, by contrast, claims that he is the rightful owner because he "paid for th[e] property" and the deed "wasn't supposed to have anybody else's name on it."  (M. Funari Depo. at 180:2–8, 194:9–195:1; *see also id.* at 220:4–13 ("I'm claiming that I purchased the property, and there should be no name on there."); *id.* at 275:20–276:3 (testifying that his dad did not "expend any moneys for the purchase of the property on Chadwick Street" and Michael never gave his father "permission or power of attorney to put himself on the deed").)  During his deposition, DiGennaro also testified that he had "no idea" how "Nicholas Funari" appeared on the deed, because it "should have been only Michael Funari from what the HUD-1 shows." (DiGennaro Depo. at 14:3–10.)

Regardless of whether "Nicholas Funari" should have been on the March 2017 deed, there is no denying that it was there and that the ambiguity about *which* Nicholas Funari it references caused confusion in the years to come.

### ii.       The September 2018 Deed

Notably, sixteen years later, Mr. Funari hired a lawyer to remove the trust from the deed and identify him as the sole owner.  (Mr. Funari Depo. at 42:10–46:7.)  In September 20, 2018, the lawyer filed a corrected deed, which identified "Nicholas Funari"—again without specifying "senior" or "junior"—as the property's sole owner.  (*Id.*)  Mr. Funari did not get Michael's permission before hiring the lawyer to file the new deed because according to him, he owned the

property and had the right to change the deed as he wished.  (*Id*. at 46:8–16 ("Q: Okay.  Now, when you sought to transfer the property from yourself as trustee to yourself, did you get permission to do that from Michael Funari?  A: No, because I paid for it and I didn't think I needed permission from him unless he lent me the money to go to the settlement.  Then I would need permission, but I don't think I needed permission.  Do you think I needed permission?"); *see also id.* at 47:4–9 (testifying that he also didn't have Michael's permission to purchase the property "in trust" in the first place).)

After the government recorded the September 2018 deed, the recorder of deeds sent notice of the new deed to "Nicholas Funari, Junior."  (M. Funari Depo. at 188:14–191:21; *see also id.* at 273:10–274:5 (explaining that the notice referred to the September 2018 deed transferring the property into the name of Nicholas Funari).)  Nicholas's social security number was listed on the notice, and similarly, up until 2018, Nicholas's social security number had been listed on the tax bills for the property.  Nicholas and Michael point to the notice and tax documents as further evidence that the "Nicholas Funari" listed on the initial deed was Nicholas Funari, *Jr.* and not Mr. Funari.

### iii.    *The October 2018 Deed*

After receiving the notice, Nicholas and Michael filed a corrective deed on October 17, 2018, conveying the property from "Michael Funari and Nicholas Funari" to "Michael Funari and Theresa Funari."  (N. Funari Depo. at 152:9–15; M. Funari Depo. at 187:19–188:18.)  Nicholas testified that he believed he had the right to transfer the property when he signed the October 2018 deed removing his name from the deed and conveying the property to Michael and his wife.  (N. Funari Depo. at 152:16–18 (testifying that he had an ownership interest in the property); *see also* M. Funari Depo. at 222:8–223:15 (testifying that Nicholas was not "impostering" as Mr. Funari when he signed over the deed because the initial deed referred to

14

Nicholas and not his father).)

Neither brother knows how the October 2018 deed was submitted to the recorder of deeds. (*See* M. Funari at 231:18–23 (testifying that he did not know whether the October 2018 deed was placed in the mail or delivered through the internet); N. Funari Depo. at 158:11–24 (same).)

### 4. __The Norwood Street Property__

Similar issues permeate the transactions related to the Norwood Street Property. It was purchased on October 5, 2001 for $40,000. (Doc. No. 57-4 at p. 2; *see also* J. Funari Depo. at 121:23–122:18.) The October 2001 deed lists the owners as "Joseph Funari and Nicholas Funari." (*See* Doc. No. 57-4 at p. 6.) Mr. Funari once again asserts that he paid the purchase price for the property and put his name and his son's name on the deed in accordance with his usual custom. (Mr. Funari Depo. at 49:24–50:3; *see also id.* 51:24–54:10 (testifying that he is listed on the deed because he "paid for it"); Weinberg Depo. at 68:2–69:1 ("Q: Is this typical and customary of your father's practice that we described earlier in purchasing investment properties and putting it in his name and one son's name? A: Correct.").) In addition, although his name does not appear on the agreement of sale, the address for the auto business that he currently operates on his own—6600 Essington Avenue—is listed on the deed as the "address of the . . . Grantee(s)." (Doc. No. 57-4 at p. 6; *see also* Weinberg Depo. at 66:23–67:18 (testifying that the Essington Avenue property is her "dad's car lot and also the address on my father's driver's license" and that Nicholas and Michael have no ownership interest in the property).)

Like Michael, Joseph disputes Mr. Funari's account and argues that he signed the agreement of sale and the settlement sheet for the Norwood Street property, that he paid the purchase price, and that he did not give his father permission to put himself on the deed. (*See* J. Funari Depo. at 160:23–163:3; *see also id.* at 119:17–19 (testifying that he solely paid the money

15

to purchase the Norwood Street property); *id.* at 122:22–123:7 (same).)  And DiGennaro again testified that he does not know how the name "Nicholas Funari" ended up on the deed, when Joseph is listed as the buyer on the agreement of sale and on the settlement sheet.  (*See* DiGennaro Depo. at 22:2–4.)

As with the Chadwick Street Property, the issue is not only whether "Nicholas Funari," should have been listed on the deed in the first place, but also to whom that name refers.  Mr. Funari claims it refers to him because he paid for the property.  The sons argue that it refers to Nicholas and that their dad placed Nicholas's name on the deed to prevent Joseph's wife from ever owning the property.  (*See* N. Depo. at 147:23–149:5; *see also id.* at 136:10–139:10 (testifying that his father told him, "I think your name should be on that property to protect your brothers, because we don't know what kind of people that they're going to marry.").)

On August 20, 2015, Nicholas and Joseph filed a deed conveying the property to Joseph Funari alone.  (N. Funari Depo. at 145:6–146:9; *see also* J. Funari Depo. at 117:1–5.)  They used the services of Defendant Attorney Rubbo to file the corrective deed.  Nicholas testified that when he signed the August 2015 deed transferring the property solely into Joseph's name, he had the right to transfer it because the initial deed referred to him.  (N. Funari Depo. at 147:5–11, 149:19–150:1.)

### 5.    The Jackson Street Property

The Jackson Street Property was purchased on July 12, 2002 for around $34,000.  (Doc. No. 58-2 at p. 2; *see also* Mr. Funari Depo. at 62:21–63:8.)  The July 2002 deed conveys the property to "Joseph Funari and Nicholas Funari."  (Doc. No. 58-2 at p. 6.)  Again, Mr. Funari claims that even though the agreement of sale listed Joseph as the only buyer, he actually paid the purchase price.  (Mr. Funari Depo. at 63:9–20, 66:2–10; *see also* Weinberg Depo. at 64:19–66:6 ("Q: Okay.  Is this typical of how your father would purchase the property and then have it

deeded in his and one of his sons?  A: Correct.").)  And as with the Norwood Street Property, the deed identifies the "address of the above named Grantee(s)" as the Essington Avenue car lot. (Doc. No. 58-2.)

Joseph disagrees and claims that he purchased the property on his own.  (*See* J. Funari Depo. at 91:21–92:10 (testifying that he purchased 2229 Jackson); *id.* at 96:23–97:7 ("Q: Did you pay the $34,000?  A: Yes. . . .  Q: Did your father contribute in any way to that money?  A: No."); *see also id.* at 104:20–105:7 ("My father never owned that property.  I was the sole owner of that property.").)  As with the other two properties, the agreement of sale and settlement documents list Joseph as the only buyer, and Joseph testified that no one else's name should have been listed on the deed.  (*See* J. Funari Depo. at 106:4–108:2 (explaining that the 2002 deed is "untrue" because "[i]t wasn't supposed to be in no other name [sic] on that deed but mine" but claiming his father added N. Funari's name at settlement); *id.* at 159:2–160:22 (testifying that he signed the agreement of sale and the settlement sheet for the Jackson Street property and that he did not give his father permission to put himself on the deed but would have accepted his brother's name); *see also* DiGennaro Depo. at 27:16–22 (testifying that he does not know how "Nicholas Funari" ended up on the deed when he was not listed as a buyer in the agreement of sale, settlement sheet, and other closing documents).)

Joseph maintains that his actions since 2002 are further proof that he is the true owner: "For the last so many years from when I owned that place, I maintained it, I fixed it, I rented it, I insured it, I paid the sales tax on it, I paid the renter's license on it, I updated it, I took care of my tenants, I paid all the taxes on it, the bills, whatever came up."  (*See* J. Funari Depo. at 94:17– 95:4.)

On August 20, 2015, Nicholas and Joseph conveyed the property to Joseph alone, using

the services of Attorney Rubbo.  (N. Funari Depo. at 135:4–24.)  Nicholas testified that when he

signed the August 2015 deed transferring the property solely into Joseph's name, he had the right

to transfer it.  (*Id*. at 142:4–13.)  He does not know if the deed was ever placed in the mail or if

the internet was used to transfer it.  (*Id*. at 142:14–143:1.)

## II.   PROCEDURAL HISTORY

On June 27, 2019, Mr. Funari filed this action against Nicholas, Joseph, Michael, Theresa

Funari, and Anthony Rubbo.  (*See* Doc. No. 1.)  The three sons answered the complaint and

asserted counterclaims for forgery and conversion, all of which were dismissed by the Honorable

Jan E. DuBois at the motion to dismiss stage.  (*See* Doc. No. 17 (dismissing the forgery counts as

improper criminal actions asserted in a civil matter and dismissing the conversion claims as

outside the statute of limitations).)  On March 3, 2020, the case was reassigned to the Honorable

Karen Spencer Marston.  (*See* Doc. No. 18.)

Nicholas, Joseph, and Michael then filed a Motion for Judgment on the Pleadings,

arguing that Mr. Funari's RICO claims (Counts I and II) fail as a matter of law and that the Court

should decline supplemental jurisdiction over the remaining state law claims.  (*See* Doc. No. 21.)

Mr. Funari opposes that motion.  (*See* Doc. No. 22.)

While that motion was pending, the parties proceeded to discovery.  And at the

conclusion of the discovery period, the sons filed a Motion for Summary Judgment, which again

seeks judgment on Mr. Funari's RICO claims and asks the Court to decline supplemental

jurisdiction over the remaining claims.  (Doc. No. 55.)  Mr. Funari opposes that motion.  (Doc.

No. 59.)  He has also filed his own Motion for Partial Summary Judgment, which asks this Court

to enter judgment in his favor on his claim to quiet title (Counts III), and his claims for

conversion (Count V), unjust enrichment (Count VIII), and constructive trust (Count XI).  (Doc.

No. 62.)  His motion is limited to the Ritner Street Property and any revenue generated by the car

lot business.  (*See generally*, *id.*)  The sons oppose that motion.  (Doc. No. 67.)

### III.    STANDARD OF REVIEW

#### A.    *Judgment on the Pleadings*

Under Federal Rule of Civil Procedure 12(c), a party may move for judgment on the pleadings after the pleadings are closed but early enough not to delay trial.  Fed. R. Civ. P. 12(c).  In reviewing a motion for judgment on the pleadings, the court "must view the facts presented in the pleadings and the inferences to be drawn therefrom in the light most favorable to the nonmoving party."  *Sikirica v. Nationwide Ins. Co.*, 416 F.3d 214, 220 (3d Cir. 2005).  "Judgment will not be granted unless the movant clearly establishes that there are no material issues of fact, and he is entitled to judgment as a matter of law."  *Id.*

#### B.    *Summary Judgment*

Summary judgment is appropriate when the "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).  A dispute is genuine if the "evidence is such that a reasonable jury could return a verdict for the nonmoving party," and a fact is material if it "might affect the outcome of the suit under the governing law."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  "[A]t summary judgment the inferences to be drawn from the underlying facts must be viewed in the light most favorable to the party opposing the motion."  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (quotation marks and alterations omitted).

This standard "does not change when the parties cross-move for summary judgment." *Krist v. Pearson Educ., Inc.*, 419 F. Supp. 3d 904, 907 (E.D. Pa. 2019).  Instead, when both parties move for summary judgment "the court must rule on each party's motion on an individual and separate basis, determining, for each side, whether a judgment may be entered in accordance

with the Rule 56 standard." *Id.* (cleaned up).

## IV.    DISCUSSION

Because the sons' motions focus on Mr. Funari's RICO claims, while Mr. Funari's motion focuses on his state law claims, we separately analyze each motion.  The Court begins with Defendants' motions before turning to Mr. Funari's motion.

### A.    *Defendants' Motions*

Nicholas, Joseph, and Michael have filed two motions—one motion for judgment on the pleadings and one for summary judgment.  In both motions, they argue that Mr. Funari's RICO claims fail as a matter of law.

Mr. Funari has asserted two RICO claims, one under 18 U.S.C. § 1962(c) and another under 18 U.S.C. § 1962(d).  Section 1962(c) renders it "unlawful for any person . . . associated with any enterprise engaged in . . . interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt."  18 U.S.C. § 1962(c).  Section 1962(d), in turn, renders it "unlawful for any person to conspire to violate" subsection (c).  18 U.S.C. § 1962(d); *see also Zavala v. Wal Mart Stores, Inc.*, 691 F.3d 527, 539 (3d Cir. 2012) ("RICO conspiracy is not mere conspiracy to commit the underlying predicate acts.  It is a conspiracy *to violate RICO—* that is, to conduct or participate in the activities of a corrupt enterprise.").  Because a § 1962(d) conspiracy claim "necessarily must fail if the substantive [§ 1962(c)] claims are themselves deficient," *see Kolar v. Preferred Real Estate Investments, Inc.*, 361 F. App'x 354, 366 (3d Cir. 2010), our analysis focuses on Mr. Funari's claim under § 1962(c).

To establish a violation of § 1962(c), the plaintiff must prove that a "person" associated with an enterprise engaged in "(1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity."  *Lum v. Bank of Am.*, 361 F.3d 217, 223 (3d Cir. 2004).  Here, Defendants

argue in their motion for judgment on the pleadings that Mr. Funari cannot identify a RICO enterprise because the "persons" and the "enterprise" are the same individuals—Nicholas, Joseph, and Michael.  (*See* Doc. No. 21-1 at p. 4.)  In their motion for summary judgment, Defendants focus on the other elements of the RICO claim and argue that Mr. Funari has failed to put forth evidence of a pattern of racketeering activity because he cannot prove that the sons committed the predicate offenses of mail and wire fraud.

### 1.   <u>Defendants' Motion for Judgment on the Pleadings</u>

As mentioned, Defendants argue that Mr. Funari cannot identify a RICO enterprise distinct from the individuals who acted on behalf of the enterprise.  We must define the relevant enterprise before turning to Defendants' arguments on distinctiveness.

#### i.    *The Association-in-Fact Enterprise*

"For the purposes of RICO, an enterprise is defined to include 'any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity.'"  *Macauley v. Estate of Nicholas*, 7 F. Supp. 3d 468, 481 (E.D. Pa. 2014).  The Supreme Court has described this statute as including "two categories of associations."  *United States v. Turkette*, 452 U.S. 576, 581 (1981).  "The first encompasses organizations such as corporations and partnerships, and other 'legal entities.'"  *Id.* "The second covers 'any union or group of individuals associated in fact although not a legal entity.'"  *Id.* at 581–82.

Here, Mr. Funari appears to concede that he neither alleged, nor uncovered, a corporate entity through which his sons filed the allegedly fraudulent deeds for the Chadwick Street Property, the Norwood Street Property, and the Jackson Street Property.  Instead, he argues that his three sons "and others named and unnamed in his Complaint," including Defendants Theresa Funari and Attorney Rubbo, constitute an "association-in-fact enterprise."  (*See* Doc. No. 22 at

pp. 15–16.)

"'An association-in-fact enterprise is a group of persons associated together for a common purpose of engaging in a course of conduct.'" *Macauley*, 7 F. Supp. 3d at 482 (quoting *United States v. Turkette*, 452 U.S. 576, 583 (1981)); *see also Boyle v. United States*, 556 U.S. 938, 946 (2009) ("As we succinctly put it in *Turkette*, an association-in-fact enterprise is a 'group of persons associated together for a common purpose of engaging in a course of conduct.'"). "To demonstrate an association-in-fact enterprise, a civil RICO plaintiff must identify at least three structural features of the enterprise: (1) a purpose; (2) relationships among those alleged to be associated with the enterprise; and (3) longevity sufficient to allow the enterprise to pursue its purpose." *Macauley*, 7 F. Supp. 3d at 482; *see also Boyle*, 556 U.S. at 946 ("From the terms of RICO, it is apparent that an association-in-fact enterprise must have at least three structural features:  a purpose, relationships among those associated with the enterprise, and longevity sufficient to permit these associates to pursue the enterprise's purpose."). The existence of the enterprise may be inferred "from the evidence showing that persons associated with the enterprise engaged in a pattern of racketeering activity." *Boyle*, 556 U.S. at 947.

Mr. Funari argues that "M. Funari, J. Funari, and N. Funari, Jr. . . . together through an association-in-fact formed an 'enterprise' between these individuals and others named and unnamed in [the] complaint." (Doc. No. 22 at pp. 15–16.)[4]  As evidence of this association-in-fact, he points to allegations in the complaint that the enterprise "came into existence no later

---

[4] Mr. Funari also argues that there is "an unnamed 'association-in-fact' between M. Funari, J. Funari, N. Funari, Jr. and Attorney Rubbo and Theresa Funari" because "[i]f there was no 'association-in-fact' these defendants would not be represented by the same counsel." (Doc. No. 22 at p. 16.)  The Court declines to find an association-in-fact merely from the fact that Defendants are represented by the same counsel.

than 2015" with the "common purpose" to "fraudulently obtain[ ] properties held by Mr. Funari by forging and uttering deeds to properties to gain possession, control, and/or for use for their own pecuniary and personal benefit." (Doc. No. 22 at p. 16 (quoting Doc. No. 1 at ¶ 85).) He also identifies Nicholas, Joseph, and Michael as the "central and controlling figures" of the enterprise, having responsibility "for oversight of the scheme to defraud Mr. Funari" and "direct[ing] other conspirators," including Defendants Theresa Funari, Attorney Rubbo,[5] "to take actions necessary to accomplish the overall aims of the RICO Enterprise." (*Id.* (quoting Doc. No. 1 at ¶ 86).) Given these allegations, we define the relevant association-in-fact enterprise as Nicholas, Joseph, and Michael, in connection with Attorney Rubbo, Theresa Funari.[6]

### ii.      Distinctiveness

It is not enough to identify the relevant enterprise. To state a RICO claim, the plaintiff must also prove "the existence of two distinct entities: (1) a 'person'; and (2) an 'enterprise' that is not simply the same 'person' referred to by a different name." *Cedrick Kushner Promotions, Ltd.*, 533 U.S. 158, 161 (2001). This is known as the "distinctiveness requirement." *Id.* at 162.

This concept is easiest to understand in the corporate context. For example, courts often find the distinctiveness requirement met when the plaintiff alleges that the "enterprise" is a corporation and the "person[s]" are the owners of that corporation. *See Cedrick Kushner Promotions, Ltd.*, 533 U.S. at 162 (finding distinctiveness requirement met because the

---

[5] Mr. Funari also identifies unnamed "real estate agents, notaries, and title agents" as being part of the association-in-fact, but there are no *factual* allegations to support a finding that these unnamed individuals shared the "common purpose" of engaging in fraudulent real estate transactions. Therefore, they are not properly viewed as part of a "group of persons associated together for a common purpose." *See Turkette*, 452 U.S. at 583.

[6] Defendants do not contest that the association-in-fact satisfies the other elements of a RICO enterprise. For example, they have not challenged whether the enterprise exists "separate from the pattern of racketeering activity." *See Walther v. Patel*, Civil Action No. 10-706, 2011 WL 382752, at *5 (E.D. Pa. Feb. 4, 2011). Because they have not raised these arguments, we do not address them here.

"corporate owner/employee, a natural person, is distinct from the corporation itself, a legally

different entity with different rights and responsibilities due to its different legal status");

*Macauley*, 7 F. Supp. 3d at 482 ("To the extent that Frank Nicholas, Casey Nicholas, and Hill

acted through [Wasubul Investments, LLC, a distinct] legal entity[,] to commit mail, wire, and

bank fraud, Wasubul Investments can constitute an enterprise for the purposes of RICO.");

*Harmelin*, 2007 WL 2874043 at *1 (finding distinctiveness where the plaintiff "allege[d] the

RICO enterprise [w]as an association consisting of [Defendant Man Financial Inc.], Paul M.

Eustace, and [Defendant Thomas] Gilmartin, working under Philadelphia Alternative Asset

Management Company, LLC ("PAAMCo")" and the "designated members of the enterprise,

PAAMCo and Eustace [w]ere not defendants in th[e] case").

The sons argue that Mr. Funari has not satisfied the distinctiveness requirement because

here the association-in-fact enterprise and the relevant "person(s)" are the same.  We disagree.

Notably, Mr. Funari argues that "M. Funari, J. Funari, and N. Funari, Jr. are the liable 'persons'

and together through an association-in-fact formed an 'enterprise' between these individuals and

others named and unnamed in [the] complaint," including Theresa Funari and Attorney Rubbo,

who are not named Defendants for purposes of the RICO claims.  (Doc. No. 22 at pp. 15–16.)

We find this sufficient, under the Rule 12(c) standard, to satisfy distinctiveness.  *See United

States v. Bergrin*, 650 F.3d 257, 269 (3d Cir. 2011) (finding that five individuals and four

corporations constituted an association-in-fact and that distinctiveness requirement was satisfied

because "each individual defendant was merely a part of, not an alter ego of, the 'association-in-

fact' enterprise"); *see also Schwartz v. Lawyers Title Ins. Co.*, 680 F. Supp. 2d 690, 706 (E.D.

Pa. 2010) ("Here, Plaintiffs have satisfied the minimum 'person' and 'enterprise' distinctiveness

requirement because the combination of Lawyers and the title agents constitute a single

'enterprise' separate and distinct from the 'person' of Defendant Lawyers and this combination is permissible under RICO jurisprudence."); *Walther*, 2011 WL 382752, at *4 ("Here, Walther alleges an enterprise made up of a natural person and various separate corporate entities.  Each are separable and legally distinct from the enterprise itself and thus satisfy the distinctiveness requirement."); *State Farm Mut. Auto Ins. Co. v. Ficchi*, Civil Action No. 10-555, 2011 WL 2313203, at *10 n.7 (E.D. Pa. June 13, 2011) ("[A] plaintiff can allege an enterprise made up of natural persons and various separate corporate entities and satisfy the distinctiveness requirement of RICO where those natural persons and corporate entities are separable and legally distinct from the RICO enterprise alleged.").

Because Mr. Funari has alleged a RICO enterprise distinct from the persons who acted on behalf of the enterprise, we deny the sons' motion for judgment on the pleadings.

### 2.   **Defendants' Motion for Summary Judgment**

Next, we turn to Nicholas, Joseph, and Michael's motion for summary judgment and analyze whether there are genuine disputes of fact about whether the association-in-fact enterprise committed the predicate crimes of mail fraud and wire fraud.

"A pattern of racketeering activity requires at least two predicate acts of racketeering." *Lum*, 361 F.3d at 223; *see also Cedric Kushner Promotions, Ltd.*, 533 U.S. at 160 (explaining that a "pattern of racketeering activity" refers to the "commission of two or more statutorily defined crimes").  "These predicate acts of racketeering may include, *inter alia*, federal mail fraud under 18 U.S.C. § 1341 or federal wire fraud under 18 U.S.C. § 1343." *Lum*, 361 F.3d at 223; *see also* 18 U.S.C. § 1961(1).

To establish mail or wire fraud, the plaintiff must prove:  "'(1) the existence of a scheme to defraud; (2) the participation by the defendant in the particular scheme with the specific intent to defraud; and (3) the use of the United States mail or of wire communications in furtherance of

the fraudulent scheme." *Sunlight Elec. Contracting Co. v. Turchi*, 918 F. Supp. 2d 392, 402

(E.D. Pa. 2013) (quoting *United States v. Syme*, 276 F.3d 131, 142 n.3 (3d Cir. 2002)); *accord*

*Kolar v. Preferred Real Estate Investments, Inc.*, 361 F. App'x 354, 362 (3d Cir. 2010) ("As

stated, a pattern of racketeering activity requires at least two predicate acts of racketeering

activity, which include indictable offenses under the federal mail and wire statutes . . . .  Those

statutory provisions, in turn, prohibit the use of the mail or interstate wires for purposes of

carrying out any scheme or artifice to defraud.").

Both offenses "require[ ] proof of specific intent."  *Sunlight Elec. Contracting Co.*, 918 F.

Supp. 2d at 402; *see also Walther*, 2008 WL 382752, at *6 (explaining that mail and wire fraud

"[b]oth require fraudulent intent").  Specific intent "may be found from a material misstatement

of fact made with reckless disregard for the truth."  *Sunlight Elec. Contracting Co.*, 918 F. Supp.

2d at 402 (cleaned up); *see also id.* ("The scheme 'must involve some sort of fraudulent

misrepresentations or omissions reasonably calculated to deceive persons of ordinary prudence

and comprehension.'" (quoting *United States v. Pearlstein*, 576 F.2d 531, 535 (3d Cir. 1978)));

*accord Kehr Packages, Inc. v. Fidelcor, Inc.*, 926 F.2d 1406, 1415 (3d Cir. 1991) ("The scheme

need not involve affirmative misrepresentation, but the statutory term 'defraud' usually signifies

the deprivation of something of value by trick, deceit, chicane or overreaching." (cleaned up));

*Kolar*, 361 F. App'x at 362 ("A scheme or artifice to defraud need not be fraudulent on its face,

but must involve some sort of fraudulent misrepresentation or omission reasonably calculated to

deceive persons of ordinary prudence and comprehension." (cleaned up)).

Defendants argue that Mr. Funari cannot show they had a specific intent to defraud their

father because "the undisputed documentation from the settlements of the three properties [at

issue] indicates that the sons were the buyers, the payors, and the rightful owners of the

properties in question," and the "sons merely filed the three deeds as corrections to protect their ownership from [Mr. Funari's] predations." (*See* Doc. No. 55-1 at pp. 15–16.)

We must disagree. There are numerous factual disputes about each property, and most notably disputes about who paid for each property and to whom each deed refers when it says "Nicholas Funari." When the evidence is viewed in the light most favorable to Mr. Funari, *he* is the buyer, payor and rightful owner of the Chadwick Street Property, the Norwood Street Property, and the Jackson Street Property, and on each deed, the name "Nicholas Funari" refers to him, not Nicholas. If these facts are true, then the sons were not merely correcting the deeds in question but were knowingly and purposefully depriving their father of his rightful ownership in each property. *See Kehr Packages, Inc.*, 926 F.2d at 1413 ("The mail fraud statute prohibits any person from knowingly causing the use of the mails' for the purpose of executing' any 'scheme or artifice to defraud.'"). Given these factual disputes we cannot find as a matter of law that the sons lacked the specific intent necessary for the predicate offenses of wire fraud and mail fraud.[7]

\* \* \*

For those reasons, we deny Defendants' motion for judgment on the pleadings and motion for summary judgment. Because the RICO claims remain, we need not address Defendants' request that we decline supplemental jurisdiction over the state law claims. Accordingly, we turn now to Mr. Funari's motion for partial summary judgment as to some of

---

[7] We question whether Mr. Funari will be able to prove the other elements of mail and wire fraud, and in particular, whether he can show "the use of the United States mail or of wire communications in furtherance of the fraudulent scheme." *Sunlight Elec. Contracting Co.*, 918 F. Supp. 2d at 402 (quotation marks omitted). Mr. Funari appears to argue that this element is satisfied because the deeds were filed with the recorder of deeds and at some point, "converted to [ ] electronic record[s] accessible through wire and internet by members of the general public." (*See* Doc. No. 59-1 at p. 14.) Because that argument is not before us at this time, we do not consider whether this is sufficient for a claim of wire or mail fraud.

those claims.

### B.   *Plaintiff's Motion for Summary Judgment*

Mr. Funari has filed his own Motion for Partial Summary Judgment (Doc. No. 62), which asks the Court to enter judgment in his favor on his claim to quiet title (Count III), and his claims for conversion (Count V), unjust enrichment (Count VIII), and constructive trust (Count XI) as they relate to the Ritner Street Property and any revenue generated by the car lot business.  (*See generally id.*)  Nicholas, Joseph, and Michael argue that factual disputes prohibit summary judgment on each count.  (*See generally* Doc. No. 67-1.)

### 1.   Count III:  Quiet Title

Mr. Funari brings his claim to quiet title pursuant to Pennsylvania Rules of Civil Procedure 1061(b)(2) and 1061(b)(3).  (*See* Doc. No. 1 at p. 33.)  Rule 1061(b)(2) states that an "action to quiet title" may be brought "where an action for ejectment will not lie, to determine any right, lien, title or interest in the land or determine the validity or discharge of any document, obligation, or deed affecting nay right, lien, title or interest in land."[8]  Rule 1061(b)(3) similarly states that an action may be brought "to compel an adverse party to file, record, cancel, surrender or satisfy of record, or admit the validity, invalidity or discharge of, any document, obligation or deed affecting any right, lien, title or interest in land."

The purpose of an action to quiet title is to "make a final determination of all rights in the land" at issue.  *Johnlaeden v. OMAT I REO*, Nos. 2185 EDA 2013, 2350 EDA 2013, 2014 WL 10976120, at *6 (Pa. Super. Ct. Mar. 14, 2014); *accord Lang v. Shaffer*, No. 1435 MDA 2013,

---

[8] The sons do not dispute that an action to quiet title pursuant to Rule 1061(b)(2) is the proper vehicle for Mr. Funari's claims.  *See Siskos v. Britz*, 790 A.2d 1000, 1008 (Pa. 2002) ("[A] court can only entertain a (b)(2) claim where it first determines that the plaintiff is not in possession."); *see also Riverwatch Condominium Owners Ass'n v. Restoration Development Corp.*, 931 A.2d 133, 139 (Pa. Commw. Ct. 2007).

2014 WL 10790197, at *4 (Pa. Super. Ct. Oct. 16, 2014) ("[A] quiet title action generally seeks

to determine the 'relative and respective rights of all potential land holders[.]'" (quoting *Siskos*,

790 A.2d at 1006)); *cf. Siskos*, 790 A.2d at 1006 ("The purpose of an ejectment action as

opposed to quiet title is not to determine the relative and respective rights of all potential title

holders, but rather the immediate plaintiff and defendant involved in that particular litigation.").

Here, there are numerous disputes of fact that prevent the Court from "determin[ing] the

relative and respective rights of all potential titleholders." *Siskos*, 790 A.2d at 1006. Of

particular importance is the parties' dispute about who signed and filed the March 2008 deed

conveying the Ritner Street Property from "Nicholas Funari, Jr. and Joseph Funari" to "Nicholas

Funari, Jr. and Nicholas Funari, Sr."[9] *See supra* Part I.B.2.i. And if the answer to that question

is Mr. Funari, then we must consider the parties' dispute about whether he had power of attorney

to sign the March 2008 deed on his sons' behalf.[10] *See supra* Part I.B.2.ii. Given these disputes

---

[9] Mr. Funari argues that Defendants cannot assert the defense of fraud because they failed to timely assert such a defense in their answer. (Doc. No. 70 at p. 6.) The Court will use its discretion to allow Defendants to assert the defense of fraud. Notably, Defendants were unaware that the power of attorney existed until Mr. Funari's deposition in January 2021—which was well after the deadline for amending pleadings. In addition, the Court notes that Mr. Funari himself strays far from the claims in his complaint, which for example, sought to quiet title as to the Chadwick Street Property, the Norwood Street Property, and the Jackson Street Property, *but not* the Ritner Street Property. (*See* Doc. No. 1 at pp. 31–36.)

[10] Nicholas, Joseph, and Michael rely on the report of handwriting expert J. Wright Leonard, CDE, which concludes that at least some of the signatures on the power of attorney are forgeries. (*See* Doc. No. 67-1 at p. 3.) Mr. Funari argues that the sons are precluded from relying on that report because it was produced on April 4, 2021, well after the January 22, 2021 deadline in the Court's Third Amended Scheduling Order. (*See* Doc. No. 66 at pp. 5–6; Doc. No. 70 at pp. 5–6.) Although we agree that Leonard's report was delivered after the relevant case management deadline, we will not preclude Defendants from relying on their handwriting expert. *See Allen v. Parkland Sch. Dist.*, 230 F. App'x 189, 194 (3d Cir. 2007) (outlining factors courts should consider when determining whether to preclude expert testimony on the basis of untimely disclosure and explaining that "exclusion of critical evidence is an extreme sanction, not normally to be imposed absent a showing of willful deception or flagrant disregard of a court order by the proponent of the evidence"). However, to limit the potential prejudice to Mr. Funari, he will be given the opportunity to hire a rebuttal expert and to depose Leonard before trial. *See Pease v. Lycoming Engines*, Civil Action No. 4:10-CV-00843, 2012 WL 162551, at *12 (M.D. Pa. Jan. 19, 2012) (declining to exclude treating physicians' expert testimony because allowing additional discovery into their opinions would not "disrupt the orderly and efficient trial of the case or other cases

of fact, it is not enough for Mr. Funari to show that Nicholas admits to forging the April 2008 deed conveying the property from "Nicholas Funari Jr. and Nicholas Funari Sr." to "Nicholas Funari, Jr. and Patricia Funari" because even if the Court finds the April 2008 deed void, we still must determine who holds proper title, a question that cannot be answered without considering the legality of the March 2008 deed.

For those reasons, the Court denies Mr. Funari's motion for summary judgment on Count III.

## 2.   Count V:  Conversion

Next, Mr. Funari seeks summary judgment on his claim for conversion, arguing that there is no genuine issue of fact about whether Nicholas, Joseph, and Michael "without the consent or approval" of Mr. Funari divested Mr. Funari of "income generated by the operation of the car lot business operating at 2200 Ritner Street."  (Doc. No. 62-1 at p. 11.)  "Conversion is an act by which another deprives one of his right of property in, or possession of, or use of a chattel, without lawful justification and without the owner's consent."  *Fort Wash. Resources, Inc. v. Tannen*, 846 F. Supp. 354, 361 (E.D. Pa. 1994).

Mr. Funari argues that "he has always maintained an ownership interest in the car lot" and that the "undisputed facts of record demonstrate" that Mr. Funari "never voluntarily relinquished ownership" and that "in calendar year of 2008, defendant Nicholas Funari, Jr. seized control of the car lot business and refused to remit revenues generated by the car lot to the plaintiff Nicholas Funari, Sr."  (Doc. No. 62-1 at 12.)  We disagree.  Defendants have put forth evidence that Mr. Funari *did* transfer the business to Nicholas.  *See supra*, Part I.B.1.  There is also evidence in the record that Mr. Funari worked part time and received a salary from the

---

before the court").

business until 2010.  (N. Funari Depo. at 34:24–35:18.)  Given these disputes of fact, the Court

denies summary judgment on Count V as well.

### 3.    Count VII:  Unjust Enrichment

Next, Mr. Funari seeks summary judgment on his unjust enrichment claim.  (Doc. No.

62-1 at p. 13.)  To prove unjust enrichment, he must show:

> (1) benefits conferred on defendant by plaintiff; (2) appreciation of
> such benefits by defendant; and (3) acceptance and retention of such
> benefits under such circumstances that it would be inequitable for
> defendant to retain the benefit without payment of value. (citations
> omitted).  The application of the doctrine depends on the particular
> factual circumstances of the case at issue.  In determining if the
> doctrine applies, our focus is not on the intention of the parties, but
> rather on whether the defendant has been unjustly enriched.

*Mitchell v. Moore*, 729 A.2d 1200, 1203–04 (Pa. Super. Ct. 1999) (quoting *Schenck v. K.E.*

*David, Ltd.*, 666 A.2d 327, 328 (Pa. Super. Ct. 1995)).

Again, Mr. Funari argues that "the undisputed facts of record" demonstrate that his sons

"fraudulently divested [him] of his ownership interest in" the Ritner Street Property and that

Nicholas "seized control of [Mr. Funari's] car lot business and refused to remit revenues

generated by the car lot to [him]."  (Doc. No. 62-1 at p. 13.)  The same disputes of fact that

preclude summary judgment on Mr. Funari's claims to quiet title and for conversion, preclude

summary judgment here.  Therefore, the Court denies summary judgment on Count VII.

### 4.    Count XI:  Constructive Trust

Finally, Mr. Funari seeks summary judgment on his claim for constructive trust.  "The

imposition of a constructive trust is an equitable remedy designed to prevent unjust enrichment."

*Moreland v. Metrovich*, 375 A.2d 772, 776 (Pa. Super. Ct. 1977); *see also Biros v. U Lock Inc.*,

255 A.3d 489, 495 (Pa. Super. Ct. 2021) ("The controlling factor in determining whether a

constructive trust should be imposed is whether it is necessary to prevent unjust enrichment."

(quotation marks omitted)).  It arises when a "person holding title to property is subject to an equitable duty to convey it to another on the ground that he would be unjustly enriched if he were permitted to retain it."  *Moreland*, 375 A.2d at 776 (quotation marks omitted).  "The necessity for such a trust may arise from circumstances evidencing fraud, duress, undue influence or mistake."  *Biros*, 255 A.3d at 495 (quoting *Nagle v. Nagle*, 799 A.2d 812, 819 (Pa. Super. Ct. 2002)).

Mr. Funari argues that the "undisputed facts of record demonstrate" that Nicholas has "fraudulently divested plaintiff Nicholas Funari, Sr. of his rightful ownership interest" in the Ritner Street Property and "revenue generated by operation of the business of the car lot . . . and inequity would result in the event defendant Nicholas Funari, Jr., was permitted to retained [sic] the same without payment to the plaintiff of value and disgorgement of the revenues generated therefrom."  (Doc. No. 62-1 at p. 15.)  As with the previous three claims, disputes of fact preclude summary judgment on Count XI.

## V.   CONCLUSION

For those reasons, Defendants' motion for judgment on the pleadings, Defendants' motion for summary judgment, and Plaintiff's motion for summary judgment are denied.

An appropriate order follows.